## Case No. 13,178.

SOULE v. RODOCANACHI et al.

RODOCANACHI et al. v. The OREGON.

[Newb. 504.]1

District Court, E. D. Louisiana. March. 1855.

SHIPPING—DAMAGE TO CARGO—BURDEN OF PROOF —ACTS OF MASTER—PLEADING—GROUND OF DAMAGE NOT SET UP IN LIBEL.

1. Where a cargo is received on board a ship in good order. and on delivery it is found in bad order, the onus probandi is upon the master of the vessel to show it was not through his fault or negligence the injury was sustained.

2. The case presented by the pleadings in a cause is the only one to which testimony can be directed. and the only one upon which the court can be called to adjudicate.

3. In a case of damage to cargo where the libel alleges the fault of the master to be, first, that he falsely represented his vessel to be tight, staunch and seaworthy; and second, that the danger resulted from the master's carelessness. negligence and improper conduct. the libelant cannot claim another specific ground of complaint not set up in the libel, as that the danger was caused by the fault of the master in not putting into some other port to repair his vessel and take measures to preserve his cargo.

4. In view of all the facts within his knowledge the master of a vessel will be justified. if in the exercise of a sound discretion he pursues the course he deemed most expedient for the benefit of all concerned.

In admiralty. The first libel [by Cornelius Soule, master of the bark Oregon, against Rodocanachi & Franghiadi] is for freight. The second libel [by Rodocanachi & Franghiadi against the bark Oregon] is for damages to cargo.

Durant & Hornor, for master of Oregon.
P. E. Bonford. for shippers.

McCALEB. District Judge. Some time in the month of October, 1854, the master of the bark Oregon. being then in the harbor of Rio de Janeiro. entered into a contract for freighting and chartering his vessel, with the shippers Rodocanachi & Franghiadi. by which he agreed to transport for a consideration stipulated in the charter party. a cargo of coffee from Rio de Janeiro to this port. The coffee was delivered in bad order, which the master of the Oregon contended was the result of the tempestuous weather he encountered on the voyage. The freight stipulated to be paid under the charter party, was refused by the shippers. upon the ground that the damage sustained by the coffee resulted from the fault of the master and the fact that the vessel was unseaworthy. The libel for freight was filed by the master on the 19th of March, 1855, against the shippers, who on their part filed their libel on the 24th of

1 [Reported by John S. Newbury, Esq.]

the same month, against the vessel, claiming damages for loss arising from the injury sustained by the coffee on the voyage. These cases have been, by consent of the proctors engaged, consolidated. The law and evidence by which the court must be guided in its judgment. are equally applicable to both.

The master of the bark Oregon, as part owner and as agent of the said bark, alleges in his libel that some time in the month of October last. that vessel being then in the port of Rio de Janeiro, he (the libelant) made and concluded a charter party, by which in consideration of the covenants and agreements therein set forth to be performed by the respondents. he did covenant and agree on the freighting and chartering of the said bark to the respondents for a voyage from the port of Rio de Janeiro to the port of New Orleans, on the terms set forth in the charter party. In pursuance of the provisions of this charter party, the respondents shipped on board of the bark 7.145 bags of coffee to be transported to the port of New Orleans. The bill of lading shows that the coffee was received on board in good order, and the master of the bark binds himself to deliver the same in like good order and condition at the port of New Orleans. The coffee arrived at this port in a damaged condition. About 5 000 bags were musty and much injured, and about 800 bags were thrown away as valueless. There were 2,731 bags which were pronounced good. Only a very small portion of these were affected by the salt water. The witnesses bear unequivocal testimony to the effect that it was the worst damaged cargo of coffee, which has to their knowledge arrived at this port from Rio de Janeiro. It is quite unnecessary to comment at length upon this testimony, inasmuch as the material fact to which it relates is admitted by both parties. There are other facts which are fully established, and which it will be only necessary to refer to. The most important of these are: First. That the bark upon which this cargo was shipped was a tight, staunch, well equipped and in all respects seaworthy vessel when she received the cargo in the harbor of Rio de Janeiro: that a preference was given to her over all other American vessels then there waiting freight, and that she obtained a higher rate than was allowed to other vessels of her class, in consequence of her acknowledged superiority.

The defence set up to the claim of the shippers for damages is, that the delivery of the cargo in a damaged state was the result of the injury sustained from the perils of the sea; and the evidence leaves no doubt upon my mind that the stormy weather encountered by the bark has not been exaggerated even by the protest. The facts set forth in that protest are substantially proved by the log-book and the depositions of the mate and seamen who were on board the vessel. The particular dates mentioned in the pro-

test were, it is true, not remembered by the seamen; but they testify to the correctness of the general statement of facts therein set forth. The mate certifies that when the bark first left Rio she encountered very heavy weather; the sea ran heavy at the time. "We shortened sail," says he, "as fast as we could until we got under a close-reefed maintopsail. At the same time the vessel shifted her cargo over on to her beam ends, the ship laying over on one side unmanageable. Her yard arms were in the water a part of the time and part out. We went below with all the men and shifted the cargo so as to right her. We then came upon deck and got the bark around on another tack. She was on her beam ends about three hours. This caused her to make water and strain very heavily. On trying the pumps we found that she had made eighteen inches water. It also stove in two or three casks of fresh water on deck. Everything was floating on deck at the same time. The coffee was damaged: all the water in the hold of the vessel, instead of being in the bottom, was on one side of the ship—the lee side. When by shifting the cargo, the bark was got off her beam ends. the water went over on to the other side and damaged the cargo there." The witness thinks the water may have penetrated one or two tiers on the starboard side. On the lee side it must have caused damage to three or four tiers. The weather became more moderate. There were two other slight gales, but not so heavy as the first. The cargo was again shifted, and the crew went below and trimmed it over to the other side to bring the ship upright. The ship was laboring very heavily, and there was a very heavy sea. The pumps were kept constantly going. On the 9th of January the main staysail and the foretopmast staysail were lost. The greatest leak the vessel had during the voyage was that causing 400 strokes an hour—eleven inches an hour. The least she made in fine weather was four or five inches in four hours. In fine weather the pumps were worked every half hour; in rough weather constantly.

The principle of law which throws the onus probandi upon the master to show that it was not through his fault or negligence that the injury was sustained, has called forth all the facts upon which the court is required in this case to adjudicate upon the rights of the parties. These facts most satisfactorily establish the causes of the injury. The previous good condition of the vessel and the care with which the cargo was placed on board, leave room for no other conclusion than that the damage to the cargo was caused by the tempestuous weather which the bark was compelled to encounter. The effect of salt water and heat in the hold of a vessel on a cargo of coffee, is too well established to admit of a doubt.

But on behalf of the shippers it is contended that the master failed in the discharge of his whole duty in not either putting back to the harbor of Rio, or running into some other harbor along the coast of South America, and there having his vessel refitted and the cargo removed and dried. This is the important point in the cause, or rather the point to which the argument of the proctors for the shippers was particularly directed. Much difficulty may be saved, however, by looking attentively to the pleadings. The case as presented by the pleadings is doubtless the only one to which the evidence has been directed, and the only one upon which the court can be called upon to decide. By a reference to the libel filed on behalf of the shippers, it will be seen that the failure on the part of the master to turn back to Rio or to run into a port of necessity on the coast of South America, is not made a specific ground of complaint; nor is there any allegation which would lead the court to presume that the refusal to satisfy the freight in this instance arose from any such omission on the part of the master. The libel referred to, clearly places the fault of the master upon the grounds: First, that he falsely represented his vessel to be tight, staunch and strong and every way suited for the transportation of the cargo; and, secondly, that the damage resulted from the carelessness, negligence and improper conduct of the master, his mariners and servants.

The evidence adduced on the part of the master has, as we have already seen, very satisfactorily shown that the representations of the master in reference to the seaworthiness of his vessel, were justified by her real condition and the preference shown for her by the shippers; and there is nothing in the testimony to prove either carelessness, negligence or improper conduct on the part of either the master or the crew. On the contrary, I conclude from the evidence of those on board, that the vessel was managed with all due care and skill, and that everything that could be done was performed by the master and those under his orders to prevent any further injury than that which was sustained in consequence of the vessel being thrown upon her beam ends and being otherwise strained from the violence of the wind and the waves.

The proctor for the shippers has relied upon the authority of Fland. Shipp. § 270, to support the principle, that if damage be done by a peril insured against or within the exceptions of the bill of lading, but the master neglects to repair that damage, and in consequence of the want of such repairs the vessel is lost, or the goods injured or destroyed, the neglect to make repairs, and not the sea damage, is treated as the proximate cause of the loss. In such a case, it is contended, that the insurers are discharged, but the carrier is liable to the shippers, and upon the ground of his neglect to make the req-

uisite repairs. But we have seen that there is nothing in the pleadings which involves this principle; and if there were, there is nothing in the evidence which shows that the master of the bark was aware of any such want of repairs as would have rendered it proper or expedient on his part, in the exercise of a sound discretion, to put back to Rio Janeiro, or to go into any other port. Are we at liberty to say that he knew immediately after the first tempestuous weather, to which his vessel was exposed, that she was so badly injured as to render probable the loss of the cargo of coffee on board? While the evidence is full to the effect that a great deal of bad weather was experienced, and that thereby the vessel made water both on her sides and about her rudder casing, there is nothing to show that any great injury had been sustained by the vessel herself. The evidence, on the contrary, shows that all the necessary repairs were made on her in this port for the sum of $95 for caulking, and $ for repairing the rudder casing.

It is impossible to say, in view of the facts which have been adduced in evidence, that the master was bound to know the extent of the damage which the cargo had sustained. The latest gales were experienced in the month of January, and it must have been, therefore, near the close of the voyage that the full extent of the injury was sustained. The injury to the rudder casing of the vessel was only ascertained by an examination in this port. It is fair to presume that the master, in the exercise of a sound discretion, pursued the course which under all the circumstances was deemed most expedient, to promote the interests of all concerned. In view of the amount of damage actually ascertained, it is easy to say what might have been done to avoid it. But as it is now impossible for us to place ourselves in a position to appreciate all the difficulties encountered by the master, all our speculations upon the propriety of his conduct, must necessarily prove unsatisfactory. "The contract of the ship owner," says Mr. Justice Story, in the case of Jordan v. Warren Ins. Co. [Case No. 7,524], "is to carry the cargo to the port of destination; but he by no means warrants the state in which it shall arrive, as it may be affected by the perils of the seas or other perils, against which his contract does not bind him. It is no answer to say, that if the cargo is carried on in a damaged state, it will be ruined. The true reply is that the ship owner has nothing to do with that; and that the shippers have no right to throw the loss of freight upon him, because the cargo is in danger of ruin by a calamity against which he did not warrant them."

After a full and attentive consideration of this case, I am of opinion that the master is entitled to the freight, and that a decree must be entered in accordance with the prayer of his libel. It is further decreed that the claim for damages be dismissed, with costs.